IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBECCA STANLEY,                )
                                )
              Plaintiff,         )
                                )
      v.                        )        1:22CV43
                                )
KILOLO KIJAKAZI,               )
Acting Commissioner of Social  )
Security,                       )
                                )
              Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Rebecca Stanley, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security ("Defendant" or "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB").  (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 16; see also Docket Entry 14 (Plaintiff's Memorandum), Docket Entry 17 (Defendant's Memorandum)).  For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 256-60), alleging an onset date of November 13, 2015 (see Tr. 256, 259).  Upon denial of that application initially (Tr. 78-96, 116-19) and on reconsideration

(Tr. 97-115, 123-26), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 127). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 45-77.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-39.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-8, 253-55, 361-63), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2020.

2. [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of November 13, 2015 through her date last insured of December 31, 2020.

. . .

3. Through the date last insured, [Plaintiff] had the following severe impairments: degenerative disc disease; degenerative joint disease; carpal tunnel syndrome; migraines; and morbid obesity.

. . .

4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform a range of sedentary work . . . . Specifically, she can lift, carry, push, and pull 10 pounds occasionally and less

2

than 10 pounds frequently; she can sit up to 6 hours total in an 8-hour workday; can stand and/or walk up to 2 hours total in an 8-hour workday; can never climb ladders, ropes, and scaffolds; but can occasionally climb ramps and stairs, occasionally balance as that term is defined in the [Dictionary of Occupational Titles ("DOT")] or the [Selected Characteristics of Occupations ("SCO")] defined [sic] therein, occasionally perform stooping, kneeling, crouching, and crawling. She can occasionally perform overhead reaching with her bilateral upper extremities and frequently perform handling and fingering. She can have occasional exposure to workplace hazards such as moving machinery and unprotected heights. She is limited to understanding, remembering, and carrying out simple instructions, which is defined to mean activity that is consistent with a reasoning level of "two," as defined in the [DOT]; can sustain concentration, attention, and pace well enough to carry out those simple instructions for two-hour intervals over the course of an eight-hour work day; and is limited to working in a low stress setting, which is specifically defined to mean: no paced production, such as on an assembly line where the worker does not control the pace of production.

. . .

6. Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [she] could have performed.

. . .

11. [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from November 13, 2015, the alleged onset date, through December 31, 2020, the date last insured.

(Tr. 19-39 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

4

is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age,

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[4]

### B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit when formulating the RFC" (Docket Entry 14 at 4 (bold font and single-spacing omitted)); and

2) "[t]he ALJ's appointment violates the Appointments Clause" (<u>id.</u> at 9 (bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (<u>See</u> Docket Entry 17 at 5-29.)

### 1. Function-by-Function Analysis

In Plaintiff's first issue on review, she asserts that "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit when formulating the RFC."

---

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

(Docket Entry 14 at 4 (bold font and single-spacing omitted).)
More specifically, Plaintiff highlights her subjective statements
and those of her brother Jonathan Wayne Stanley, as well as certain
medical evidence, regarding her ability to sit that she believes
supported greater limitations in the RFC (see id. at 4-6 (citing
Tr. 64, 66, 292, 297, 300, 305, 370, 392, 421-22, 492, 519, 527,
550, 568-69, 641, 644, 652, 673, 675, 699, 709, 729, 764)), and
argues that, "[d]espite th[at] testimony and medical evidence, the
ALJ . . . f[ound] that [Plaintiff] could perform up to the full six
hours of sitting in an eight-hour work day," and "incorporated no
limitations with regard to how long [Plaintiff] could maintain a
seated posture at one time" (id. at 6 (citing Tr. 26)).  According
to Plaintiff, "the ALJ performed the function-by-function analysis
with regards to [Plaintiff]'s ability to stand and walk" (id. at 7
(citing Tr. 34-35)), but "d[id] not perform the same analysis with
[her] ability to sit and never explain[ed] why she [wa]s not more
limited with regard to sitting in the RFC" (id. (citing Tr. 26-
37)).  Plaintiff deems that failure by the ALJ "important because
the calculation of frequency of position change (much like the
calculation of time off task) can be outcome determinative."  (Id.
at 8 (citing Holland v. Commissioner of Soc. Sec. Admin., Civ. No.
17-1874, 2018 WL 1970745, at *10 (D. Md. Apr. 25, 2018)
(unpublished)).)

9

Plaintiff further faults the ALJ for failing to "explain how she decided which of [Plaintiff]'s statements and evidence to believe and 'which to discredit, other than the vague (and circular) boilerplate statement that [s]he did not believe any claims of limitations beyond what [s]he found when considering [Plaintiff's RFC].'" (Id. at 7 (some brackets added) (quoting Mascio v. Colvin, 780 F.3d 632, 639-40 (4th Cir. 2015)).) In Plaintiff's view, "'[h]aving met [her] threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [she wa]s entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that [her] pain [wa]s so continuous and/or so severe as to prevent [her] from working a full eight hour day.'" (Id. at 8 (quoting Hines, 453 F.3d at 565).) Plaintiff additionally emphasizes that "[t]he [United States Court of Appeals for the] Fourth Circuit . . . in Dowling . . . determined that the ALJ should have specifically addressed the claimant's testimony regarding how long [s]he was capable of sitting, especially in light of a sedentary RFC." (Id. (citing Dowling v. Commissioner of Soc. Sec., 986 F.3d 377, 388-89 (4th Cir. 2021)).) Plaintiff ultimately contends that "the case must be remanded for further proceedings" (id. at 9), because "the [VE] was not questioned regarding how any limitations with sitting would impact the sedentary occupational base" (id.

Case 1:22-cv-00043-CCE-LPA   Document 18   Filed 01/19/23   Page 10 of 47

(citing Tr. 75-76)).  Plaintiff's arguments do not entitle her to relief.

RFC measures the most a claimant can do despite any physical and mental limitations.  <u>Hines</u>, 453 F.3d at 562; 20 C.F.R. § 404.1545(a).  An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain.  <u>See</u> <u>Hines</u>, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b).  The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy).  <u>See</u> 20 C.F.R. § 404.1567.  Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level.  <u>See</u> 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination.  <u>See Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014).  However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion."  <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related

11

abilities on a function-by-function basis. . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Social Security Ruling 96-8p, _Policy Interpretation Ruling Titles II and XVI: Assessing [RFC] in Initial Claims_, 1996 WL 374184, at *1 (July 2, 1994) ("SSR 96-8p").

The Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand. _See_ _Mascio_, 780 F.3d at 636–37. Specifically, it stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," _id._ at 636, but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" _id._ (internal brackets and ellipsis omitted) (quoting _Cichocki v. Astrue_, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ did not perform an express function-by-function analysis of Plaintiff's ability to sit (_see_ Tr. 26-37); however, no basis for remand exists, because the ALJ's decision supplies the necessary "accurate and logical bridge," _Woods_, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's lumbar spine degenerative disc disease

12

(A) qualified as a severe impairment (see Tr. 20), but (B) did not cause limitations greater than the RFC's allowance of up to six hours of sitting in an eight-hour workday (see Tr. 26).

As an initial matter, to the extent Plaintiff intends her contention that she could "rely exclusively on subjective evidence to prove . . . that [her] pain [wa]s so continuous and/or so severe as to prevent [her] from working a full eight hour day'" (id. at 8 (quoting Hines, 453 F.3d at 565)) to mean that the ALJ erred by considering objective medical evidence in analyzing the intensity, persistence, and limiting effects of Plaintiff's symptoms, such an argument misses the mark. Although the Fourth Circuit recently "reiterate[d ] long-standing [Circuit] law . . . that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020), long-standing cases containing the substance of that holding, such as Craig and Hines (among others), clarify that, "[a]lthough a claimant's allegations about her [symptoms] may not be discredited solely because they are not substantiated by objective evidence of the [symptoms themselves] or [their] severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the

13

claimant alleges she suffers," Craig, 76 F.3d at 595 (emphasis added); see also Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms; however, Arakas, Craig, and Hines do not compel ALJs to consider only subjective evidence, as such a requirement would conflict with the regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 20 C.F.R. § 404.1529(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources); see also 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

Here, in compliance with Arakas, Hines, and Craig, the ALJ considered the objective medical evidence as one part of her evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms. (See Tr. 26-37.) As detailed below,

14

the ALJ also considered Plaintiff's "subjective reports to medical providers[, ] the nature and apparent effectiveness of treatment" (Tr. 34-35), and the opinion evidence of record (see Tr. 35-37).[5]

Turning to Plaintiff's assertions regarding the function-by-function analysis, those assertions fall short because the ALJ's evaluation of Plaintiff's subjective symptom reporting elucidates the ALJ's RFC findings regarding Plaintiff's ability to sit. In that regard, the ALJ explicitly acknowledged Plaintiff's statements "that her pain is tolerable if she is laying down on her side, but [that] sitting or standing exacerbates her pain" (Tr. 27 (emphasis added) (referencing Tr. 64-65)), as well as that, "[i]f she sits in a chair her legs will become numb after 10 to 15 minutes" (id. (emphasis added) (referencing Tr. 66)). The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the

_____

[5] Plaintiff's complaint that the ALJ utilized a "vague (and circular) boilerplate statement that [s]he did not believe any claims of limitations beyond what [s]he found when considering [Plaintiff's RFC]" (Docket Entry 14 at 7 (some brackets added)) also lacks merit. The Mascio court held that an ALJ erred by finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible to the extent they are inconsistent with the [ RFC] assessment," because "th[at] boilerplate gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility." Mascio, 780 F.3d at 639 (emphasis added) (internal footnote and quotation marks omitted). The court noted that "the ALJ [] should have compared [the plaintiff]'s alleged functional limitations from pain to the other evidence in the record, not to [her RFC]." Id. In contrast, the ALJ here did not use the forbidden language in her finding regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms. (See Tr. 27.)

15

record" (id.) and, beyond Plaintiff's meritless assertions under Hines and Mascio (see Docket Entry 14 at 7, 8) discussed above, she has not challenged that finding by the ALJ (see id. at 4-9).

The ALJ's evaluation of the opinion evidence provides further support for the up to six-hour sitting allowance in the RFC. In particular, the ALJ found the opinions of the state agency medical consultants to have "little persuasive value" (Tr. 36), because the consultants opined that Plaintiff remained capable of a range of light work involving occasional lifting of 20 pounds and frequent lifting of 10 pounds (see Tr. 90, 108-09), noting that "more recent evidence, including both objective imaging scans and treatment notes from after the[ consultants'] opinions were issued, sufficiently demonstrate[d Plaintiff] as being limited to less than the full range of sedentary exertional activity" (Tr. 36 (emphasis added)), involving occasional lifting of only 10 pounds and frequent lifting of less than 10 pounds (see Tr. 26). Notably, the ALJ did not discount the consultants' opinions that Plaintiff remained capable of sitting for up to six hours in an eight-hour workday. (See Tr. 36; see also Tr. 90, 109.) The ALJ also found a Medical Statement from Nurse Practitioner Ayeshia Powell dated June 14, 2021 (Tr. 764), only "partially persuasive," deeming Nurse Powell's opinion that Plaintiff could sit for only 30 minutes at a time "not supported by any narrative explanation and [] not

16

consistent with overall record evidence, including treatment records" (Tr. 37).

In turn, the ALJ's discussion of the "overall record evidence, including treatment records" (Tr. 37) additionally supports the RFC's allowance for up to six hours of sitting in a workday. In particular, as the following observations by the ALJ make clear, Plaintiff consistently reported that <u>bending, lifting, and weightbearing activities such as standing and walking</u> (as opposed to <u>sitting</u>) aggravated her lower back and leg pain, and that physical therapy and her medications rendered that pain tolerable and allowed her to function:

- "On November 9, 2015, [Plaintiff] returned to [Angela R. Boone, AGNP,] with complaints of leg pain in the left posterior upper leg and left posterior lower leg, described as aching and stinging and exacerbated by <u>weightbearing</u>." (Tr. 27 (citing Tr. 570-71) (emphasis added));

- "After 9 physical therapy visits, [the physical therapist] made a re-evaluation of [Plaintiff] on January 17, 2016, noting that she rated her low back pain as a <u>1</u> out of a possible 10 that day, . . . stating that her lower extremity symptoms had <u>resolved</u>," and "that her low back pain increases to a 4 out of a possible 10 with <u>standing</u> of longer than 20 minutes . . . ." (Tr. 28 (citing Tr. 419-20) (emphasis added));

- "[Plaintiff] only attended one additional therapy treatment and was later 'considered self-discharged, secondary to <u>noncompliance</u> with established plan of care.'" (<u>Id.</u> (quoting Tr. 418) (emphasis added) (internal parenthetical citation omitted);

- "On June 10, 2016, David A. O'Toole, M.D., saw [Plaintiff] for evaluation and treatment options

17

of . . . low back pain with associated dysesthesias . . . into her left lower extremity," and Plaintiff reported that her "pain was exacerbated with . . . <u>lifting, bending, standing, and walking</u>. . . . [S]traight leg raising tests were <u>negative</u> bilaterally." (Tr. 29 (citing Tr. 405-10) (emphasis added));

- "On follow-up with Dr. O'Toole on September 21, 2016, [Plaintiff] reported <u>good relief</u> of her lower back symptoms with her leg pain '<u>pretty much resolved</u>.'" (Tr. 30 (quoting Tr. 404) (emphasis added));

- "On June 14, 2017, [Plaintiff] transitioned care to Greensboro Orthopaedics and . . . described low back symptoms including stiffness and pain with range of motion, more on the left side, with weakness and pain in the legs, exacerbated with <u>standing and walking</u>." (<u>Id.</u> (citing Tr. 491-92) (emphasis added));

- "Dr. [Kofi] Doonquah evaluated [Plaintiff] on May 10, 2018[, and ] noted that [Plaintiff]'s . . . 'pain medication help[ed] her be able to perform her [activities of daily living] as well as light housework.'" (Tr. 31 (quoting Tr. 652) (closing quotation mark added));

- "At [Plaintiff's ] follow-up [with Dr. Doonquah] on July 12, 2018, [Plaintiff] reported that [] her chronic pain . . . w[as] '<u>stable</u>,' and that she was able to perform her activities of daily living as well as light housework." (<u>Id.</u> (quoting Tr. 657) (emphasis added) (internal parenthetical citation omitted));

- "[Plaintiff] returned to Nurse Powell on August 6, 2019 and . . . complained of . . . lower back pain[] and difficulties with her left leg shaking if she <u>stands</u> for too long." (Tr. 32 (citing Tr. 697-99) (emphasis added));

- "On June 18, 2020, . . . Nurse Powell noted [Plaintiff] stated that her lower back pain was <u>stable</u>, and [that she] was more concerned with her <u>neck</u> pain." (Tr. 33 (citing Tr. 675-78) (emphasis added)); and

18

- "[O]n August 24, 2020[, Plaintiff] reported [to Dr. Ashish C. Shah] that her lumbar back pain with radiation to the left lower extremity with weakness had symptoms that were 'mild and improving' though exacerbated by back motion, prolonged standing, and bending." (Id. (quoting Tr. 757) (internal parenthetical citation omitted) (emphasis added)).

That evidence suffices to support the ALJ's finding in the RFC that Plaintiff remained able to sit for up to six hours in an eight-hour workday.

Moreover, by pointing to record evidence Plaintiff believes supports greater limitations on her ability to sit, she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's finding regarding Plaintiff's ability to sit, and not whether other record evidence weighed against that finding, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Additionally, the evidence Plaintiff cites in support of her instant contentions (see Docket Entry 14 at 4-6 (citing Tr. 64, 66, 292, 297, 300, 305, 370, 392, 421-22, 492, 519, 527, 550, 568-69,

19

641, 644, 652, 673, 675, 699, 709, 729, 764)) would not have compelled the ALJ to adopt a greater sitting limitation in the RFC. Some of that evidence reflects Plaintiff's <u>subjective</u> reports of difficulty sitting (<u>see</u> <u>id.</u> at 4-5 (citing Tr. 64, 66, 292, 297, 421, 550, 675)), which ALJ discounted (<u>see</u> Tr. 27), in a manner which (for reasons discussed above) withstands Plaintiff's challenges (<u>see</u> Docket Entry 14 at 7-8). Other records constitute opinions from Plaintiff's brother that Plaintiff can sit for "a few minutes" at a time (Tr. 300, 305), and Nurse Powell that Plaintiff "is permanently disabled" (Tr. 673) and can sit for 30 minutes at a time (<u>see</u> Tr. 764); however, the ALJ discounted those opinions as "not consistent with the overall record evidence" (Tr. 36), as involving an issue "reserved to the Commissioner" (<u>id.</u>), and as "not supported by any narrative explanation and [as] not consistent with overall record evidence" (Tr. 37), respectively, and Plaintiff did not challenge those findings by the ALJ (<u>see</u> Docket Entry 14). The remainder of that evidence supports the ALJ's finding that Plaintiff's lumbar degenerative disc disease qualified as a severe impairment (<u>see</u> Tr. 20) that "limit[ed] her to [] very significant restrictions as described [in the RFC finding] as a reduced range of sedentary work" (Tr. 34), but does not address <u>at all</u> Plaintiff's ability to sit. (<u>See</u> Docket Entry 14 at 5-6 (citing Tr. 370 & 492 (MRI of lumbar spine and review of same by orthopedic physician assistant), 392 (treatment note reflecting tenderness in

20

lumbar spine), 422 (physical therapy note documenting positive, left-sided straight leg raising and sciatic nerve tension tests), 519 (office visit with primary care provider recording complaints of pain in multiple joints), 525-27 (primary care treatment note documenting complaints of lower back pain radiating to left buttock and thigh described as "mild and improving" and "exacerbated by back motion, prolonged standing and bending" (emphasis added)), 568-69 (treatment on alleged onset date with primary care provider containing reports of lower back, left hip, and left leg pain and numbness), 641-44 (visit to neurologist for complaints of lower back pain radiating down left leg and reporting limits on abilities to stand and walk), 652 (neurology visit recording Plaintiff's report that "she gets the most relief from laying flat on her back or at a slight angle in the recliner"), 697-99 (neurology treatment record describing Plaintiff's function as worse and reflecting her reported limitations in standing and walking), 709 (report from neurologist reflecting Plaintiff's statement in the history of present illness section that "[h]er function continues to be markedly limited by the condition of her spine and the resultant pain"), 728-29 (orthopedist treatment record noting that Plaintiff's obesity contributed to her back pain)).)

Finally, Plaintiff has not shown that the ALJ's decision violated Dowling. In that case, the plaintiff "argued throughout her administrative and judicial proceedings that her [inflammatory

bowel disease] and anal fissure caused her to experience discomfort when she s[at] for a prolonged period of time." Dowling, 986 F.3d at 388 (emphasis added). In contrast, here, the record entirely lacks such consistent complaints of difficulty sitting by Plaintiff. Although in her hearing testimony (see Tr. 64-66) and a Function Report submitted to the SSA (see Tr. 292, 297), Plaintiff claimed a decreased ability to sit due to pain, the ALJ discounted Plaintiff's subjective symptom reporting (see Tr. 27) and, as explained *supra*, Plaintiff has not demonstrated error with respect to that finding. Moreover, Plaintiff routinely reported to her medical providers throughout the relevant period in this case that her lower back pain limited her abilities to lift, bend, stand, and/or walk (see Tr. 525, 557, 641, 655, 687, 697, 701, 704, 757) and, consistent with that fact, the ALJ placed substantial limits in the RFC on lifting, bending (i.e., stooping and crouching), standing, and walking (see Tr. 26; see also Tr. 34 (containing ALJ's explanation that she considered Plaintiff's "subjective reports to medical providers" in determining RFC)).[6]

---

[6] The record contains just three occasions on which Plaintiff reported a decreased ability to sit to her providers, none of which would have compelled the ALJ to adopt a greater sitting limitation in the RFC. On December 21, 2015, shortly after Plaintiff began a medical leave of absence for back and leg pain, she reported to her physical therapist that her current level of functioning included a one-hour sitting tolerance. (See Tr. 421.) Just over a month later, however, Plaintiff informed the therapist that her back pain rated as just 1 on a scale of 1 to 10, that her lower extremity radicular symptoms had resolved, and that standing for 20 minutes increased her back pain (see Tr. 419). Although Plaintiff told her primary care provider on April 1, 2016, that she could not "sit or stand for long periods without severe pain" (Tr. 550 (emphasis added)), that report prompted the provider to refer Plaintiff to pain management (see id.), after which Plaintiff made no more reports to her providers of difficulty
(continued...)

In light of the foregoing analysis, the Court should deny relief on Plaintiff's first assignment of error.

## 2. Appointments Clause

Plaintiff's second and final issue on review maintains that "[t]he ALJ's appointment violates the Appointments Clause" of the U.S. Constitution. (Docket Entry 14 at 9 (bold font omitted) (referencing U.S. Const. art. II, § 2, cl. 2).) In particular, Plaintiff contends that "[t]he ALJ's appointment by Nancy Berryhill on July 16, 2018, violates the Appointments Clause because Nancy Berryhill was no longer the Acting Commissioner on that date and, therefore, lacked the authority to ratify the ALJ's appointment." (Id. (internal parenthetical citation omitted).) According to Plaintiff, Berryhill "became Acting Commissioner of SSA on January 20, 2017, when President Donald Trump assumed office and then[-]Acting Commissioner Carolyn Colvin resigned." (Id. (citing U.S. Gov't Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998—Commissioner, Social Security Administration," www.gao.gov/ assets/700/690502.pdf, at 1 (Mar. 6, 2018) ("GAO Notice")).) Plaintiff points out that, "[o]n March 6, 2018, the GAO [Notice]

---

[6](...continued)
sitting for over <u>four years</u>, when she advised Nurse Powell, on June 16, 2020, that she could not sit, stand, or walk "<u>for very long</u>" (Tr. 675 (emphasis added)). After that time, Plaintiff's reports to her providers focused on difficulty <u>bending, standing, walking, and maintaining her balance</u>. (<u>See</u> Tr. 701, 704, 757.) Such isolated complaints of difficulty sitting distinguish the instant case from <u>Dowling</u>.

23

reported that Berryhill's service as Acting Commissioner under the [Federal Vacancies Reform Act ('FVRA')] had expired on November 16, 2017, and that her service after that date violated the FVRA." (Id. at 10 (citing GAO Notice, at 2).)  Plaintiff thus argues that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective because her period of acting service had expired on November 16, 2017, and the FVRA did not allow her to resume acting as Commissioner at a later date." (Id. (citing Brian T.D. v. Kijakazi, 580 F. Supp. 3d 615, 629 (D. Minn. 2022), appeal filed sub nom Dahle v. Kijakazi, No. 22-1601 (8th Cir. Mar. 22, 2022).)  Plaintiff's argument falls short.

a.   The FVRA

Resolution of Plaintiff's third issue on review turns on interpretation of the FVRA, which:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required. 5 U.S.C. § 3345 et seq.  The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Id. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers. Id. § 3345(a)(2)– (a)(3). . . . The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency. Id. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is

24

not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," id. § 3348(d)(1), and any such action "may not be ratified," id. § 3348(d)(2).

Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs., 496 F. Supp. 3d 31, 53 (D.D.C. 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021). The specific provision of the FVRA at issue in this case, governing the time limits on serving in an acting capacity under the FVRA, provides as follows:

> (a) . . . the person serving as an acting officer as described under section 3345 may serve in the office--
>
> (1) for no longer than 210 days beginning on the date the vacancy occurs; or
>
> (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.
>
> (b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.
>
> (2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--
>
> (A) until the second nomination is confirmed; or
>
> (B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

25

b. <u>Factual Background</u>

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. <u>See</u> "Memorandum Providing an Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. <u>See</u> GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired on November 16, 2017. <u>See</u> GAO Notice, at 2.[7] Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO. <u>See</u> <u>Patterson v. Berryhill</u>, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished). On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA

---

[7] The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017). 5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017 constituted the 300th day after the January 20th inauguration.

26

interpreted as permitting Berryhill to resume serving as Acting Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision. See Reuter v. Saul, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), recommendation adopted, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

On June 21, 2018, the United States Supreme Court issued Lucia v. Securities & Exh. Comm'n, 585 U.S. ___, 138 S. Ct. 2044 (2018), which held, based on its prior case Freytag v. Commissioner of Int. Rev., 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions." Lucia, 585 U.S. at ___, 138 S. Ct. at 2053 (internal quotation marks omitted).[8] Because the SEC ALJ who decided the plaintiff's case lacked "the kind of appointment the [Appointments] Clause requires," i.e., appointment by the "President alone," "the Courts of Law," or "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2, the Supreme

---

[8] The Appointments Clause provides as follows:

[The President of the United States] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

Case 1:22-cv-00043-CCE-LPA   Document 18   Filed 01/19/23   Page 27 of 47

Court "held that the appropriate remedy for an adjudication tainted with an appointments violation [wa]s a new hearing before a [different,] properly appointed official." Id. at ___, 138 S. Ct. at 2055 (internal quotation marks omitted).

Although "[Lucia] did not specifically address the constitutional status of ALJs who work in . . . the [SSA, t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the [DOJ], on July 16, 2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security." Id.

c. Brian T.D.

As discussed above, Plaintiff relies primarily on the reasoning in Brian T.D. to support her argument that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective." (Docket Entry 14 at 10 (citing Brian T.D., 580 F. Supp. 3d at 629).) In that case, the court concluded that, because "Section 3346(a) [of the FVRA] applies to 'the person serving as an acting officer,'" Brian T.D., 580 F. Supp. 3d at 629 (emphasis added) (quoting 5 U.S.C. § 3346(a)), and because, "[w]hen

28

Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then <u>serving</u> as Acting Commissioner," <u>id.</u> (emphasis added), "by its plain language, § 3346(a)(2) d[id] not apply to Berryhill," <u>id.</u>; <u>see also</u> <u>id.</u> (stating that "[c]ourts have frequently looked to Congress' choice of verb tense to interpret statutes," and that, "[w]hen a [c]ourt is determining the meaning of an Act of Congress, the present tense generally does not include the past" (citing <u>Carr v. U.S.</u>, 560 U.S. 438, 447 (2010) (in turn, citing the Dictionary Act, 1 U.S.C. § 1))).

The <u>Brian T.D.</u> court thereafter provided further interpretations of the FVRA that purportedly supported its above-described conclusion regarding Section 3346(a)(2)'s inapplicability to Berryhill, including that:

- "[s]ubsection [3346](b)(1) states that if a nomination is rejected, withdrawn, or returned, 'the person may **continue to serve** as the acting officer for no more than 210 days[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(1)), and "[s]ubsection [3346](b)(2) states that if a second nomination is unsuccessful, 'the person **serving** as the acting officer may **continue to serve**[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(2));

- "§ 3348 [of the FVRA] confirms this reading[ because, u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete," <u>id.</u> at 630 (quoting 5 U.S.C. § 3348(b)(1) & (2)); <u>see also</u> <u>id.</u> at 631 ("[t]o accept [the Commissioner]'s interpretation of § 3346(a)(2) would require the Court to ignore (or rewrite) § 3348");

29

- the Commissioner's interpretation of Section 3346(a) as "allow[ing] Berryhill to resume acting as Commissioner (that is, to spring back into that position) when President Trump nominated Saul, even though her initial statutory term had expired . . . misreads the statutory language[, because t]he word 'or' modifies the entire provision that limits the acting officer to a period 'no longer than' 210 days from the date the vacancy arose[ and, t]hus, when read with the entirety of subsection [3346](a)(1)[,] 'or' serves to suspend that time limitation, not to create an entirely separate and distinct period of service," id. (some internal quotation marks omitted) (quoting 5 U.S.C. § 3346(a)(1)).

For the reasons more fully explained below, the Court should decline to follow the reasoning of Brian T.D. and conclude that Berryhill properly served as Acting Commissioner under the spring-back provision of Section 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs in July 2018.

d. Analysis

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985); however, in construing the text of the FVRA, Brian T.D. misconstrues Congress's use of the present tense verb "serving" in Section 3346(a)(1), Brian T.D., 580 F. Supp. 3d at 629. In that regard, the court noted that "Congress, in enacting § 3346, used the present participle 'serving,' rather than the past or present perfect 'served' or 'has served'" and thus that "Section 3346(a)

30

. . . applies to the person <u>presently</u> serving in that capacity and not to a person who had previously served as Acting Commissioner." <u>Id.</u> (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served' or 'has served'" to set out the time limits for acting officials under the FVRA would not make sense. Had Congress drafted Section 3346(a) to provide that "the person [who served or who has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time limits <u>only for individuals who had already served as acting officers</u>, which renders the time limits nonsensical. <u>See</u> <u>United States v. Turkette</u>, 452 U.S. 576, 580 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); <u>see also</u> <u>Sorrells v. United States</u>, 287 U.S. 435, 447 (1932) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to . . . an absurd consequence."); <u>Harris v. United States</u>, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided"). Construing the phrase "the person <u>serving</u> as an acting officer as <u>described</u> under section 3345," 5 U.S.C. § 3346(a) (emphasis added), as merely <u>descriptive</u>, i.e., as explaining that the time limits apply to acting officers

31

under Section 3345 of the FVRA, as opposed to acting officers under other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a).

Moreover, as the Commissioner argues:

> Reading § 3346(a)'s prefatory phrase to limit that subsection's application to only "the person presently serving in [an acting] capacity," Brian T.D., [580 F. Supp. 3d at 629], would also create an irreconcilable conflict with § 3345. Under the FVRA, the default rule is that the first assistant automatically becomes the acting official, but the President can subsequently displace the first assistant from her acting role by choosing another acting official. *See* 5 U.S.C. § 3345(a)(1)-(3); *see also Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019). But if § 3346(a) applied only to a "presently serving" acting officer, it would incorrectly bar the President from designating an alternative acting official. Were the President to designate an acting official after the first assistant had assumed the role by default, the alternative official would not be the person *presently* "serving as an acting officer as described under section 3345." Under the *Brian T.D.* court's misinterpretation of that phrase, § 3346(a) thus would not permit her to serve *at all* because § 3346(a)'s prefatory phrase applies to service under both § 3346(a)(1) and (a)(2). By the same token, were a first assistant serving as an acting official to die, resign, or otherwise be unable to serve during the vacancy, the President would be incapable of replacing her.

(Docket Entry 17 at 22-23.) The Court should construe the meaning of the word "serving" in Section 3346(a) in a manner that does not create inconsistencies with other provisions of the FVRA. See NLRB v. Wheeling Electric Co., 444 F.2d 783, 787 (4th Cir. 1971) ("The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect . . . and where a literal interpretation of a statutory provision would not accord

32

with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute." (citations omitted)); <u>Milan Puskar Health Right v. Crouch</u>, 549 F. Supp. 3d 482, 490 (S.D.W. Va. 2021) ("[T]he [c]ourt . . . is obligated to avoid statutory interpretations that lead to absurd . . . results if 'alternative interpretations consistent with the legislative purpose are available.'" (quoting <u>Griffin v. Oceanic Contractors, Inc.</u>, 458 U.S. 564, 575 (1982))).

The <u>Brian T.D.</u> court next found that the "structure and context" of Section 3346 supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill. <u>Brian T.D.</u>, 580 F. Supp. 3d at 629. In support of that finding, the court noted that:

> [s]ubsection (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may **continue to serve** as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) states that if a second nomination is unsuccessful, "the person **serving** as the acting officer may **continue to serve**." <u>Id.</u> § 3346(b)(2) (emphasis added). Therefore, the plain language of § 3346, indicates that the use of the present participle is deliberate — only a person presently serving may continue to serve. The plain language of § 3346(a)(2) means that it only applies to a person presently serving as Acting Commissioner if at the time of nomination, someone "is performing the functions and duties" in accordance with the FVRA. There is no good reason for construing the word "serving" when used in the first paragraph of § 3346(a) differently than when it is used in § 3346(b).

<u>Id.</u> at 629-30.

Case 1:22-cv-00043-CCE-LPA   Document 18   Filed 01/19/23   Page 33 of 47

As discussed above, interpreting the phrase "the person serving as the acting officer" in Section 3346(a) as descriptive rather than as a limitation to individuals presently holding the acting official role comports with common sense. Moreover, the Brian T.D. court's emphasis on the "continue to serve" language in Sections 3346(b)(1) and 3346(b)(2) actually undermines that court's reasoning. In those sections, Congress made clear that an acting official may "continue to serve" in that role for 210 days after the failure of a first or second nomination to the Senate. 5 U.S.C. §§ 3346(b)(1), (b)(2). Had Congress wished to allow an acting official to continue to serve beyond the initial 210 days only if a nomination occurred during that initial 210-day period, Congress could easily have included that same "continue to serve" language in Section 3346(a)(2), but did not do so.

The Brian T.D. court next maintained that "§ 3348 confirm[ed its] reading" of Section 3346(a)(2) because, "[u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete." Brian T.D., 580 F. Supp. 3d at 630 (quoting 5 U.S.C. § 3348(b)). The court disagreed with the Commissioner's "interpret[ation of] § 3346 as providing a person with authority to serve in an acting role (as distinct from merely defining the length of that service)," and pointed out that "§ 3345 [] provides the authority to act as an officer, while § 3346 merely defines the

34

period of that service." Id. at 632. In other words, the court reasoned, "[s]omeone cannot avoid § 3348's directive that the 'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." Id.

The Brian T.D. court provided no authority for its interpretation precluding Berryhill from invoking Section 3346 to avoid the "remain vacant" provision of Section 3348(b) and to authorize the "spring back" into her role as Acting Commissioner upon the nomination of Saul, because Section 3346 prescribes only "time limits," id. See id. In fact, Section 3346(a)(2) does not just address "time limits," i.e., "for the period that the nomination is pending in the Senate," as that Section also prescribes a condition, i.e., a nomination to the Senate, which triggers an additional period of service. Moreover, Section 3348(b)(1) explicitly ties the "remain vacant" provision to the phrase "performing the functions and duties in accordance with sections 3345, 3346, and 3347," 5 U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill immediately resumed performing the duties of the office in an acting capacity upon Saul's nomination in accordance "with § 3346(a)(2) (as well as § 3345(a)), § 3348(b)(1) did not require the office to 'remain vacant'" (Docket Entry 17 at 25 (emphasis added)).

35

The _Brian T.D._ court further based its interpretation of Section 3346(a)(2)'s inapplicability to Berryhill on the following analysis of the meaning of the word "or":

> [The Commissioner's] interpretation [of Section 3346(a)] misreads the statutory language. The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service.
>
> A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; **or** . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. _Id._ § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. _United States v. Smith_, 35 F.3d 344, 346 (8th Cir. 1994). In this statute "or" serves to provide an alternative **length** of service not to create a series of non-contiguous periods of service. If the statute were read to create three distinct periods of service — the initial 210 days, the first nominee period, and the second nominee period — the statute would have used the word "and" to separate the three periods of service.
>
> Construing the word "or" to mean "and," as [the Commissioner] argues for here, is conjunctive and "clearly in contravention of its ordinary usage." _Id._ The plain reading and ordinary usage of the word "or" in § 3346(a) is that a person serving as Acting Commissioner may serve for a 210-day period from the start of the vacancy, **or** if the person is already "serving as acting officer" according to the FVRA, may continue serving during the pendency of a timely nomination. The 210-day period is a limitation on Berryhill's acting service and after the 210-day limitation had expired, she could not later return to acting service, turning § 3346's "or" into an "and."

_Brian T. D._, 580 F. Supp. 3d at 631 (emphasis supplied by _Brian T.D._).

36

The Commissioner persuasively argues that the Brian T.D. court's above-quoted interpretation of the word "or" in Section 3346(a)(1) constitutes an unreasonable construction of that commonly-used word:

> The use of "or" to mean either one or both of two options is routine. "The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). "'The meaning of *or* is usually inclusive.'" *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. G-05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995)). For example, if a server comes to a table and asks whether anyone would like "dessert or coffee," no one would interpret that to preclude ordering both.

(Docket Entry 17 at 18 n.7 (underscoring added).) Indeed, as well-explained by another district court:

> Authorities agree that . . . or has an inclusive sense as well as an exclusive sense." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011). In its inclusive sense, "or" means "A or B, or both." *Id.* In its exclusive sense, "or" means "A or B, but not both." *Id.* Although "or" is used in both senses in common usage, "[t]he meaning of or is usually inclusive." *Id.* (quoting Scott J. Burnham, *The Contract Drafting Guidebook* 163 (1992)) (internal quotation marks omitted).
>
> [The defendant] argues as if the court must choose between construing "or" in its exclusive sense or construing it to mean "and." But . . . both senses of "or" are commonly used. In fact, the inclusive use of "or" is the more common.

B-50.com, LLC v. InfoSync Servs., LLC, No. 3:10CV1994, 2014 WL 285096, at *6–7 (N.D. Tex. Jan. 27, 2014) (unpublished) (emphasis added) (certain citations omitted); see also Great Lakes Ins. SE v. Lassiter, No. 21-21452-CIV, 2022 WL 1288741, at *10 (S.D. Fla. Apr.

29, 2022) (unpublished) ("If the [p]olicy sought to use 'or' in an exclusive sense, then it would have prevented such overlap by prefacing the definition with a qualifier like '<u>either</u>.'" (emphasis added)); <u>Mason v. Range Res.-Appalachia LLC</u>, 120 F. Supp. 3d 425, 445 (W.D. Pa. 2015) ("'Stating the matter broadly, we can say that in a permissive sentence the inclusive "or" is interchangeable with the several "and." Again, <u>this does not say that "and" means "or</u>." It says that in such a context the two words are reciprocally related: the implied meaning of one is the same as the express meaning of the other.'" (quoting Maurice B. Kirk, <u>Legal Drafting: The Ambiguity of "And" and "Or</u>," 2 Tex. Tech L. Rev. 235, 243 (1971))); <u>Allstate Ins. Co. v. Plambeck</u>, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014) (noting that, "[a]bsent a qualifying '<u>either</u>,' 'or' is typically interpreted in the inclusive manner" and explaining that statute in question lacked "limiting words or phrases — such as '<u>either</u>' or '<u>but not both</u>' — that might support reading [the statute]'s use of 'or' in the 'exclusive' sense" (emphasis added) (internal quotation marks omitted)).

Here, the word "or" appears in a permissive sentence, i.e., "the person serving as an acting officer as described under section 3345 <u>may serve</u> in the office," 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as "either" and "but not both," <u>see</u> <u>id.</u> Accordingly, the Court should interpret the word "or" in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill

38

to serve both as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), and to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2). Notably, Congress did <u>not</u> include language in Section 3346(a)(2) clarifying that the period of service under that Section applied <u>only if the nomination to the Senate occurred during the pendency of the initial, 210-day period of service</u>. See <u>N.L.R.B. v. SW Gen., Inc.</u>, ___ U.S. ___, ___, 137 S. Ct. 929, 939 (2017) (rejecting NLRB's interpretation of Section 3345 of the FVRA, while noting that Congress "could easily have chosen clearer language," as well as finding that "'[t]he fact that Congress did not adopt [] readily available and apparent alternative [language] strongly support[ed]'" the Supreme Court's interpretation of Section 3345 (brackets omitted) (quoting <u>Knight v. Commissioner</u>, 552 U.S. 181, 188 (2008)).[9]

Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and

---

[9] Another section of the FVRA makes clear that Congress knew how to include language indicating that certain time periods for service did not permit breaks in service:

> [T]he President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department <u>without a break in service</u>, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

5 U.S.C. § 3345(c)(1) (emphasis added).

Case 1:22-cv-00043-CCE-LPA   Document 18   Filed 01/19/23   Page 39 of 47

that Section 3346(a)(2) authorizes a second, permissible period of service for Berryhill:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added).[10]  Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA.  Compare S.2176, 105th Cong., § 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

The Brian T.D. court focused on a different part of the FVRA's legislative history to support its reasoning.  Section 3348(b) of Senate Bill 2176 provided, in pertinent part, as follows:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs--
>
> (A) the office shall remain vacant until the President submits a first nomination to the Senate; and . . .
>
> (2) if the President does not submit a second nomination to the Senate within 150 days after the date of the rejection, withdrawal, or return of the first nomination--

---

[10] The version of the FVRA Congress ultimately passed expanded the term an acting official could serve from 150 days to 210 days.  See 5 U.S.C. § 3346(a).

40

> (A) the office shall remain vacant <u>until the President submits a second nomination to the Senate</u>.

S.2176, 105th Cong., § 3348(b), available at www.congress.gov/bill/105th-congress/senate-bill/2176/text (emphasis added) (quotation marks omitted). The <u>Brian T.D.</u> court found that the absence of the above-emphasized language in FVRA's final text supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill:

> The FVRA's final text does not include the express "spring-back" language. Publ. L. 105-277, § 151, 112 Stat. 2681 (Oct. 21, 1998). Enacting the FVRA included a "period of intense negotiations" and resulted in "a compromise measure." *N.L.R.B.*, [___ U.S. at ___,] 137 S. Ct. at 942. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *Id.*
>
> Here, the Senate Report shows that the Senate considered allowing an officer who had previously acted as Commissioner to return to acting service upon a nomination to the Senate, however Congress chose not to include such language in the final, enacted version of the FVRA. Certainly, the original language of § 3348 demonstrates that if Congress had intended the FVRA to contain a spring back provision they were able to craft such language to clearly and unambiguously express that intent. At best the reliance on the Senate Report illustrates the folly of attempting to discern legislative intent from statements made during the legislative process. *See id.* at 942-93; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572[] (2011) ("When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.").

<u>Brian T.D.</u>, 580 F. Supp. 3d at 633.

<u>Brian T.D.</u>'s reasoning falls short, because the Senate Report did not tie its interpretation of Section 3346(a)(2) as a spring-

41

back provision to the language in Section 3348(b) providing that the office remain vacant "<u>until the President submits a first [or second] nomination to the Senate</u>," 5 U.S.C. § 3348(b) (emphasis added); rather, the Report grounded its interpretation in the language of <u>Section 3346 itself</u>:

> <u>Under new section 3346(a)(2)</u>, . . . [t]he acting officer may serve <u>even if the nomination is submitted after the 150 days has passed</u> although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, 1998 WL 404532, at *14 (emphasis added). As the Commissioner argued in <u>Brian T.D.</u>, the final version of the FVRA likely did not include the language in question from Senate Bill 2176's Section 3348, because the plain text of Section 3346(a) rendered that language unnecessary. <u>See</u> <u>Brian T.D.</u>, 580 F. Supp. 3d at 633.

In addition, cases interpreting the application of Section 3346(a)(2) have also concluded that Section 3346(a)(2) serves as a spring-back provision. In a case outside of the SSA context, another district court held as follows:

> Executive Order [13753 ('EO 13753')] designated its order of succession [for the position of Secretary of the Department of Homeland Security ('DHS')] pursuant to the FVRA, which includes a 210-day time limit for acting officials "beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). Here, [Secretary of DHS Kirstjen] Nielsen resigned on April 10, 2019, and far more than 210 days passed before [the Acting Secretary of DHS under EO 13753 Peter] Gaynor purported to amend the order of succession [to list DHS Under Secretary for Strategy, Policy, and Plans Chad Wolf as Acting Secretary of DHS], potentially rendering [Gaynor's] action void. <u>But a</u>

42

> separate provision of the FVRA permits an acting official
> to serve "from the date of" a first nomination for the
> vacant office and "for the period that the nomination is
> pending in the Senate." Id. § 3346(a)(2). Because
> President Trump nominated Wolf [to serve as Secretary of
> DHS] the same day that Gaynor purported to amend the
> order of succession, Gaynor was lawfully serving as
> Acting Secretary under [EO 13753] and the FVRA at the
> time he amended the order of succession.

Northwest Immigrant Rts. Project, 496 F. Supp. 3d at 57–58
(emphasis added). Cases addressing Section 3346(a)(2) in the
setting of a claim for benefits under the SSA have also found it to
provide Berryhill with the authority to spring back into her role
as Acting Commissioner. See Taylor v. Kijakazi, No. 1:21CV648,
2022 WL 4668273, at *9 (M.D.N.C. Aug. 2, 2022) (unpublished)
(Webster, M.J.) (noting "agree[ment] with the other judges from
this Court, Circuit, and others who have considered this issue at
considerable length and concluded that this appointment clause
argument [under the FVRA] has no merit"), recommendation adopted,
2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (unpublished) (Osteen,
J.); Lance M. v. Kijakazi, No. 2:21CV628, 2022 WL 3009122, at *11
(E.D. Va. July 13, 2022) (unpublished) ("[T]he plain language and
legislative history of the FVRA confirm that Berryhill could resume
her service after Saul's nomination was submitted notwithstanding
the fact that her original 210-day period expired before the Senate
received his nomination."), recommendation adopted, 2022 WL 3007588
(E.D. Va. July 28, 2022) (unpublished); Williams v. Kijakazi, No.
1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022)

(unpublished) (characterizing holding in Brian T.D. as "an outlier
that conflicts with the plain text of the FVRA, nearly every other
court to address the issue, as well as the views of the Executive
Branch and the Legislative Branch - all of which agree that
§ 3346(a)(2) permits an acting official serving under the FVRA to
serve during the pendency of a first or second nomination even when
that nomination was submitted after the initial 210-day period for
acting service has expired"); Early v. Kijakazi, No. 5:21CV96, 2022
WL 2057467, at *4 (W.D.N.C. June 7, 2022) (unpublished) (expressly
disagreeing with Brian T.D. and holding: "[T]he plain language of
5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role
as Acting Commissioner on the date that Andrew Saul was nominated.
Consequently, she had the necessary statutory authority to ratify
the appointment the ALJs in 2018 and [the p]laintiff's [] argument
fails."), appeal filed sub nom., Rush v. Kijakazi, No. 22-1797 (4th
Cir. June 21, 2021); Thomas S. v. Commissioner of Soc. Sec., No.
C21-5213, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022)
(unpublished) ("The FVRA contains a 'spring-back' provision that
enabled Berryhill to resume her role as Acting Commissioner as of
the date that [] Saul was nominated for Commissioner in April
2018."); Reuter, 2020 WL 7222109, at *15 ("Berryhill actually held
the title of Acting Commissioner of Social Security twice. She
first assumed the role on January 21, 2017. . . . Immediately
following the GAO[ Notice], [] Berryhill stepped down from her role

44

as Acting Commissioner and continued to lead the agency from her [DCO] position of record. . . .  [H]owever, on April 17, 2018, the President nominated [] Saul to be the next Commissioner of Social Security. . . .  The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination."); <u>Patterson</u>, 2018 WL 8367459, at *1 ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination.").

Finally, the DOJ has, <u>since at least 1999</u>, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> <u>The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted</u>.  If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative.  <u>If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.</u>

DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted).  Like the DOJ, the GAO - the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, <u>see</u> GAO Notice, at 1 - also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to

45

the Senate, <u>see</u> GAO, No. B-328888, "Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/ b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA "contains a <u>spring-back provision</u> that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official <u>whose initial 210-days had expired "could resume her service as Acting Director . . . when the President submitted [a] nomination to the Senate</u>" (emphasis added)).

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018. Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court should find that Berryhill lawfully ratified the SSA's ALJs' appointments as her own on July 16, 2018, and thus that Plaintiff's second issue on review fails as a matter of law.

Case 1:22-cv-00043-CCE-LPA   Document 18   Filed 01/19/23   Page 46 of 47

### III.  CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 19, 2023